**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PAUL SIMONS,<br>an individual,<br>Plaintiff,<br>v.<br>DITTO TRADE, INC.,<br>an Illinois corporation,<br>DITTO HOLDINGS, INC.,<br>a Delaware corporation,<br>JOSEPH FOX, an individual,<br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Paul Simons ("Simons" or "Plaintiff") for his Complaint against defendants Ditto Trade, Inc. ("Ditto Trade"), Ditto Holdings, Inc. ("Ditto Holdings") (collectively "Ditto"), and Joseph Fox ("Fox") (collectively with Ditto, "Defendants"), hereby alleges as follows:

## NATURE OF THE CASE

1.      This action arises from Defendants' unlawful retaliation against Simons for reporting to the Ditto Holdings Board of Directors and the Securities and Exchange Commission ("SEC"), in fulfillment of his fiduciary duties, evidence of potential past and ongoing wrongdoing and fraud being perpetrated on Ditto Trade, Ditto Holdings, and Ditto Holdings' shareholders. This apparent wrongdoing included, among other things, misappropriation of funds and possible violations of state and federal securities laws.

2.      In July 2011, Simons left a high-level Managing Director position at Credit Suisse Securities to pursue entrepreneurial opportunities. In December of 2012, after a number of conversations with Ditto co-founder Fox regarding the possibility of Ditto Trade becoming a vendor to Simons' planned new venture, Simons agreed instead to join Ditto Trade as CEO. Because the cash compensation Ditto Trade could afford was a fraction of

what Simons had previously earned in executive positions at large Wall Street securities trading firms, Simons' agreement to sign on with Ditto was based in large part on Fox's promise that Simons would receive substantial equity participation in Ditto and on financial information Fox provided about Ditto. Simons was willing to take the risk of accepting equity compensation because he believed he could leverage his vision as CEO to create substantial value utilizing Ditto's technology, business model, and existing revenue streams.

3.     After joining Ditto in January 2013, Simons made significant strides in increasing Ditto Trade's market presence and industry partnerships. Simons' contribution to Ditto was considerable, and his achievements on behalf of the company were widely acknowledged.

4.     In August 2013, Simons, along with two other executives – the President of Ditto Holdings and the CFO of Ditto Trade, both co-founders of Ditto – became aware of credible and substantial evidence of potential malfeasance and violations of securities laws by Fox. This included (among other things) evidence that Fox had used Ditto funds to finance a film being produced by his son, pay non-employee members of his family, and pay for his and his family's personal travel, leisure, and housing expenses. In addition, there was evidence that Fox was improperly selling his personal shares of Ditto Holdings stock at the same time the company was engaged in a Regulation D offering of its own shares.

5.     In September 2013, Simons and the two other Ditto executives brought evidence of the potential malfeasance and securities laws violations to the attention of attorneys for Ditto and members of the Ditto Holdings Board. When it appeared that the Ditto attorneys and Board were not going to respond appropriately to protect Ditto and its shareholders from further harm, Simons reported the possible securities violations to the

SEC. The very next day, Simons was terminated from his position as CEO of Ditto Trade. Five days later, he was removed from the Board of Ditto Holdings, and shortly thereafter Ditto Entities brought a lawsuit against him in Illinois state court (the "Cook County Lawsuit") purporting to seek $40 million in damages.

6.     Fox and Ditto fraudulently induced Simons to join Ditto and accept a predominantly securities-based compensation package, took advantage of his experience, credibility, ideas, and commitment to advance Ditto's success, and then retaliated against him for discovering and reporting evidence of potential wrongdoing – as was his duty as an Officer and a Director – and  maliciously disparaged him to employees, shareholders, and others.

7.     As described in more detail below, Defendants' conduct violated Federal and Illinois laws and gives rise to claims for improper retaliatory discharge, retaliation against whistleblowers, breach of contract, violations of wage collection laws, defamation, and fraud. Simons seeks compensatory and punitive damages, indemnification in connection with the Cook County Lawsuit, reinstatement, attorneys' fees and costs, and other appropriate relief.

## THE PARTIES

8.     Plaintiff Paul Simons is an individual residing in Purchase, New York. Simons was formerly employed as the CEO of Ditto Trade, held the position of Executive Vice President of Ditto Holdings, and served on the Board of Directors of Ditto Holdings.

9.     Ditto Holdings is a private shareholder-owned Delaware corporation with its principal place of business in Los Angeles, California.  On information and belief, Ditto Holdings has approximately 200 shareholders and has periodically raised capital since 2009 by selling shares under Regulation D of the Securities Act of 1933.  Ditto Holdings is the parent company of Ditto Trade.

10.     Ditto Trade is an Illinois corporation with its principal place of business in Chicago, Illinois.  Ditto Trade is a registered broker/dealer operating as an online retail stock trading company.  Ditto Trade is Ditto Holdings' sole operating subsidiary.

11.     Joseph Fox is a California resident, and is a co-founder and CEO of Ditto Holdings.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity between Simons and all of the Defendants.

13.     In addition, this Court has jurisdiction over Count I of this action under 28 U.S.C. § 1331 and 15 U.S.C. § 78u-6(h)(1)(B)(i) because it arises under Section 922 of Dodd-Frank Act.  This Court has jurisdiction over Counts V and VI because they arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5.  This Court has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they arise out of the same transactions and occurrences as Counts I, V and VI.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims in this action took place in the Northern District of Illinois.  Venue is proper under Section 27 of the Securities Exchange Act of 1934 because Defendants conduct business in this district, the alleged wrongful conduct in part took place in this district and Ditto's principal executive offices, where their operations are managed, are in this district.

## STATEMENT OF FACTS

### Simons' Employment with Ditto Trade

15.     Before joining Ditto Trade, Simons was an executive in the financial services industry for 25 years.  In the years prior to joining Ditto Trade, he was a Managing Director and Head of Americas Wealth Management Solutions at Credit Suisse Securities.  He also served as the co-head of the U.S. Private Banking Division of Credit Suisse.  Prior to working at Credit Suisse, he spent over 15 years as an executive at Merrill Lynch and held a Managing Director role there starting in 2001.  During the years 2007-2011, Simons' annual total compensation averaged nearly $2 million per year.

16.     Simons left his high-level financial services industry position to explore and pursue various entrepreneurial opportunities.  In November 2012, as Simons was completing a business plan for a venture he planned to launch in 2013, he came across Ditto Trade in his search for platforms on which to launch his new business.  He inquired about Ditto Trade's capabilities, and, in follow-up conversations, it became clear that Ditto Trade, instead of offering services to Simons' new venture, was interested in employing Simons as a Ditto Trade executive to execute his vision for the benefit of Ditto.

17.     Fox invited Simons to Los Angeles in December 2012 to discuss Simons' abandoning his planned venture and instead taking on a leadership position at Ditto Trade.  Simons reviewed financial, strategic and technology information Fox provided, and negotiated a total compensation package designed to approximate the financial reward Simons demanded based on his experience, credentials, prior earnings, and the opportunity cost of working for Ditto Trade in lieu of launching his own venture.  Simons joined Ditto Trade as CEO on January 2, 2013.

**Simons' Contracts with Ditto Entities**

A.      The Employment Letter and Stock Option Grant

18.      Based on Simons' qualifications, level of experience and compensation during previous years, and Ditto Trade's inability, as an early stage company, to offer commensurate cash compensation to Simons, Simons and Fox negotiated a total compensation package consisting of approximately 10 percent salary and 90 percent equity.

19.      Fox delivered to Simons an Offer Letter of Employment (the "Employment Letter") on December 19, 2012 outlining the terms under which Simons would become an employee of Ditto Trade commencing on January 2, 2013.  Simons agreed to the terms of the Employment Letter.  A true and correct copy of the Employment Letter is attached hereto as Exhibit A.

20.      Under the Employment Letter, Ditto Trade was to pay Simons an annual salary of $120,000, which amounts to a bi-weekly gross paycheck in the amount of $4,615.38.

21.      In addition, Paragraph 3 of the Employment Letter provided for Simons to be granted stock options.  Under a Stock Option Grant Notice, dated January 2, 2013, Ditto Holdings granted Simons 1,500,000 options to purchase shares of Ditto Holdings at an exercise price of $.70 per share. A true and correct copy of the Stock Option Grant Notice is attached hereto as Exhibit B.

22.      The Stock Option Grant Notice was accompanied by the Ditto Holdings, Inc. 2013 Equity Incentive Plan Stock Option Agreement (the "Stock Option Agreement").  The Stock Option Agreement included a vesting clause for termination without cause, stating that on or after July 2, 2013 but before January 2, 2014, the option for Simons to purchase 375,000 shares would vest, and if he was terminated without cause on or after January 2, 2014 but before January 2, 2015, his option to purchase another 375,000 shares would vest. A

6

true and correct copy of the Stock Option Agreement is attached hereto as pages 2-3 of
Exhibit B.

B.      The Consulting Agreement, Termination Agreement and Warrant Grant

        23.     In addition to the Employment Letter, Fox (on behalf of Ditto Holdings)
offered Simons a Consulting Agreement (the "Consulting Agreement"), under which Simons
was to provide certain corporate finance advisory services to Ditto Holdings in return for
equity-based compensation.  Simons and Ditto Holdings entered into the Consulting
Agreement on December 20, 2012.

        24.     In May, 2013, Fox asked Simons to focus exclusively on running the Chicago
office of Ditto Trade and driving execution of the growth strategy which Simons had
developed for the company.  Simons agreed.  On May 16, 2013, at Fox's direction, Stuart
Cohn, Executive Vice President and General Counsel of Ditto Holdings, e-mailed Simons a
Termination Agreement documenting the termination of the Consulting Agreement and a
Warrant Grant (the "Warrant Grant"), both dated May 1, 2013.   The Warrant Grant granted
Simons the fully vested option to purchase 300,000 shares of the common stock of the Ditto
Holdings at $0.05 per share.  The Termination Agreement stated that the "issuance of the
Warrant is in full satisfaction of [Ditto Holdings'] compensation obligations to [Simons]
under the Consulting Agreement." A true and correct copy of the Termination Agreement is
attached hereto as Exhibit C.  A true and correct copy of the Warrant Grant is attached hereto
as Exhibit D.

        25.     On May 17, 2013, Simons received an email from Fox (on behalf of Ditto)
acknowledging the Warrant Grant and agreeing to provide a bonus sufficient to cover the cost
of exercising the warrants.  The email stated: "Paul, I am going to pay for your warrant

7

exercise with a bonus (grossed up). Welcome to being a shareholder." A true and correct copy of the email memorializing the agreement to provide a bonus to pay for the warrants is attached hereto as Exhibit E.

C.     The Chicago Expenses Reimbursement Agreement

26.     In conjunction with asking Simons to run the Chicago office of Ditto, Fox (on behalf of Ditto) agreed to pay Simons' expenses for commuting to Chicago, including the cost to procure and maintain a corporate residence in the vicinity of the Chicago office. Fox agreed to pay Simons' expenses for working in Chicago in lieu of Ditto Trade's commitment contained in Simons' Employment Letter to "endeavor to procure office space in or about Greenwich, CT or Manhattan for your use and that of other Company staff."

27.     At Fox's request, and with his knowledge and approval, Simons procured a one-year lease of unit 1105 at 8 East Randolph Street, Chicago, Illinois at the rate of $2,700 per month plus expenses, including utilities and furniture rentals, for Simons' use as well as that of other company personnel as needed. Because the condominium bylaws precluded a corporate tenant, Simons signed the lease agreement personally, again with Fox's knowledge and approval. Simons and Defendants expected and intended that Ditto Holdings would pay or reimburse Simons' expenses in connection with the lease. From May through September 2013, Ditto Holdings paid all bills for rent and expenses.

**Simons Joins the Board and Receives a Restricted Stock Grant**

28.     In July 2013, Fox asked Simons to join the 3-person Board of Directors of Ditto Holdings. Fox also asked him to present the company's growth strategy at the annual Shareholder Meeting on July 24. On July 24, 2013, Simons was elected to become a member of the Ditto Holdings Board by a vote of the shareholders.

29. On August 27, 2013, Fox (on behalf of Ditto Holdings) rewarded Simons with a discretionary grant of 250,000 shares of restricted stock in recognition of his achievements and contribution to Ditto (the "Restricted Stock Grant"). The Restricted Stock Grant stated that the "restrictions shall lapse" in the event of "the termination of the holder with the Company without cause." A true and correct copy of the Restricted Stock Grant is attached hereto as Exhibit F. Fox represented to Simons that the shares for the Restricted Stock Grant would come from Fox's existing 3,000,000 shares of Restricted Stock, so as not to dilute the shares of Ditto Holdings.

**Indemnity Provisions for Officers and Directors**

30. The bylaws of Ditto Holdings (the "Ditto Bylaws") provide that Ditto Holdings shall indemnify the directors and officers of Ditto Holdings in the manner and to the full extent provided by the General Corporation Law of the State of Delaware, provided the director or officer acted in good faith in a manner he reasonably believed to be in the best interests of Ditto Holdings. The Bylaws further provide that the directors and officers of Ditto Holdings shall be fully protected with respect to any claims relating to actions taken or refused to be taken in reliance on the advice of counsel. A true and correct copy of this section of the Ditto Bylaws is attached hereto as Exhibit G.

31. Likewise, the Certificate of Incorporation of Ditto Holdings provides that officers and directors shall be indemnified to the fullest extent allowable under Delaware law and that a director of Ditto shall not be personally liable to the corporation or its stockholders for breach of fiduciary duty as a director except for liability for (i) breach of the duty of loyalty to the corporation or its stockholders, (ii) acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law, (iii) under Section 174 of the

General Corporation Law of Delaware, or (iv) for any transaction from which the director derived improper personal benefit. A true and correct copy of this section of the Certificate of Incorporation of Ditto Holdings is attached hereto as <u>Exhibit H.</u>

32.     Section 145(b) of the Delaware General Corporation Law permits indemnification of a person made party to a suit by the corporation by reason of the fact that the person is or was a director or officer of the corporation, or was serving at the request of the corporation as an officer of another corporation, against expenses (including attorneys' fees) actually and reasonably incurred in connection with the defense or settlement of such suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interest of the corporation (except where the person is adjudged liable to the corporation unless the Court of Chancery or court in which the suit was brought determines the person is entitled to indemnity).

**Confidentiality Agreement between Simons and Ditto**

33.     On January 2, 2013 Simons signed a Ditto Holdings "Employees, Contractors and Consultants Confidentiality, Intellectual Property, and Non-Competition Agreement." (the "Confidentiality Agreement"). A true and correct copy of this section of the Confidentiality Agreement is attached hereto as <u>Exhibit I</u>.

34.     The Confidentiality Agreement is the only agreement which Simons has with Ditto that defines "cause" for termination. It defines "cause" as "(i) misappropriation of property of the Company; (ii) conviction of, or pleading nolo contendere to, any felony or an offense involving moral turpitude under federal, state or local laws, regulations or ordinances, (iii) dishonesty, fraud, theft or embezzlement; or (iv) a material breach of any of the terms of this Agreement, after notice and expiration of a reasonable cure period in the case of a breach

that does not fall within clauses (i), (ii), or (iii) above." At no time did Simons ever engage in any conduct whatsoever meeting the criteria for "cause."

35.     The Confidentiality Agreement states, with respect to non-competition and non-solicitation, that the clauses governing those topics "shall not apply" if the "employment or engagement is terminated by the Company without cause." A termination for "cause" requires the employee to not, for a period of eighteen months after employment has been terminated, "(1) engage in any business activity competitive with activities of the Company (referred to collectively as the 'Business'" or "(2) solicit for or do business on any project involving the Business, or any component thereof, with any customer or partner of the Company or any potential customer or partner (as defined below) of the Company with whom or with which I have had contact during my employment or engagement by the Company."

**Simons' Performance at Ditto Trade**

36.     In Spring and Summer 2013, Simons achieved many important successes for Ditto, and his contributions were repeatedly acknowledged by Fox and others.

37.     On February 5th, 2013, at Fox's request, Simons presented the execution and growth strategy for Ditto, which he had developed at Fox's request, at an all-company meeting in Chicago. After the meeting, Fox proclaimed to all employees that what Simons presented was in fact the new road map for Ditto's success. Fox incorporated Simons' strategy into all of Ditto's presentation materials, and the presentation was well-received and acknowledged by a number of senior executives, including co-founder and Executive Vice President Brian Lund. After the presentation, Lund wrote "I think you hit a homerun today." Fox wrote "Everyone I spoke to is jazzed up!" and Stuart Cohn wrote "Thanks Paul. You

11

have devoted a lot of time and serious thought to these issues and the best strategic path for the company, and we are all the beneficiaries."

38.     In March 2013, Simons successfully negotiated and executed a joint marketing agreement with StockTwits, a social networking site for investors and traders, which was extremely significant and something that Fox, on behalf of Ditto, had been trying to accomplish unsuccessfully for several years.  Fox acknowledged in an email to all employees on March 18, 2013, that "This is fantastic news! Sure, we started the conversation 2 years ago, but it was Paul that got ST to put ink to paper."  Fox added "This is a great day for Ditto!" and further on May 13, 2013, "Absolutely incredible that you got this deal done without any major investment!"

39.     Throughout the ensuing months, Simons successfully led efforts to revamp many components of Ditto's offering and value proposition, and continued to sign significant new contracts on behalf of Ditto.

40.     In late August 2013 Simons also secured a slot as a lead presenter at the annual Stocktoberfest conference in San Diego scheduled for October 2013.  D. Jonathan Rosenberg, a Ditto Holdings Board Member, called this achievement "absolutely awesome."

41.     In a letter to shareholders dated September 12, 2013, two days after Simons' termination, Fox reported a five-fold increase in revenues since January 2013 (corresponding precisely to Simons' tenure as CEO) and announced the launch of "the biggest enhancement to the post login portion of our site in the history of our Company," an initiative that was executed according to Simons' vision and under Simons' leadership.

**Officers of Ditto Holdings and Ditto Trade Uncover Financial Irregularities**

42.     During the week of August 19, 2013, Simons and Jeremy Mann (Chief Financial Officer of Ditto Trade and an Executive Vice President and co-founder of Ditto Holdings) were reviewing an updated company share register, capitalization table, potential shareholder buy-back list that Fox had prepared, and other related information in preparation for an upcoming meeting with potential investors.  Fox was aware of the review Simons and Mann were conducting as he was scheduled to attend the meeting with Simons.  Simons and Fox had discussed the materials, and Simons had prepared various shareholder analyses and proposals at Fox's request.

43.     In reviewing the updated materials Simons noticed a number of anomalies, which appeared to indicate that Fox had been improperly selling his founder's shares in the Company personally, concurrent with a Regulation D offering of company shares.

44.     Specifically, a number of these transactions had occurred following an investor presentation after which Fox had reported to the management team that he had raised between $2 and $4 million in "fresh capital" for the company.  These personal share sales, the proceeds of which approximated $1.2 million, suggested that Fox may have violated securities laws and diverted capital from the company to himself personally.  Simons also suspected that a local radio show host and promoter of Ditto Holdings in Colorado, may have been compensated for facilitating such transactions with substantial grants of stock and/or warrants in Ditto Holdings.  News media reports indicate that this promoter has a felony conviction and has had various securities licenses suspended or denied.

45.     Mann confirmed Fox's private share transactions after consulting and reviewing the agreements with General Counsel Stuart Cohn.  Mann also informed Simons that in addition to being granted and having exercised warrants to purchase over 700,000

shares of Ditto stock at a price of one penny per share, the Colorado promoter had been paid over $240,000 in cash. Concerned about these findings, Simons and Mann conducted further examination of bank statements and other financial records for both Ditto entities.

46. Among other things, the ensuing examination revealed over $1.5 million in expenditures and transactions by Ditto that may have personally benefitted Fox, his family members, and others connected to him. These expenditures appeared to have no legitimate business purpose and seemed to contradict certain disclosures in regulatory filings.

47. Among the expenditures Simons and Mann discovered were the following:

a.    Payments appearing to total approximately $170,000 to, or on behalf of, Fox's son, Jorden Fox, relating to apartment rent, legal expenses, and the production of a movie;

b.    Payments appearing to total nearly $69,000 to medical providers on behalf of Fox and his extended family;

c.    Payments appearing to total approximately $167,000 to, or on behalf of, Fox relating to the cost of his primary residence, personal car(s), insurance and utilities;

d.    Charges and cash withdrawals appearing to total almost $46,000 at various Las Vegas resorts and casinos at times when Ditto did not appear to have business activities in Las Vegas;

e.    Payments appearing to total almost $178,000 to, or on behalf of, Fox's brother, Avi Fox, without any indicated or apparent business purpose;

f.    Payments appearing to total almost $87,000 to, or on behalf of, Fox's brother, Yitz Fox, without any indicated or apparent business purpose;

g. Payments appearing to total approximately $47,000 to credit card accounts that do not belong to Ditto;

h. Payments appearing to total almost $58,000 to Fox's wife, Lauren Fox, without any indicated or apparent business purpose;

i. Cash withdrawals of unknown business purpose attributed to Fox appearing to total nearly $144,000;

j. Payments appearing to total $15,000 to Market Action (believed to be controlled by the son of the Ditto's General Counsel); and

k. Payments appearing to total $4,800, apparently for a birthday party for Jorden Fox.

48. Other records, including the purchase agreements and register for Fox's personal share sales and public SEC FORM D-Notice of Exempt Offering of Securities filings (which did not disclose any payments of finder's fees), appeared to suggest potential violations of securities laws. Additionally, Mann confirmed to Simons that Fox's son, Jorden Fox was a signatory on at least one Ditto bank account.

49. By late August 2013, Simons and Mann had spent several weeks investigating the various irregularities, had discussed them with Stillman. At that point, Simons determined he had an obligation to disclose the findings and compel Ditto Holdings to conduct a proper examination of its financial and capital raising history. Simons had specific concerns related to Ditto Trade as a regulated broker/dealer and FINRA member, the appearance of defrauding of investors, and the possibility of securities laws violations and their potential obligations to report violations to regulatory authorities.

50.     Simons, Mann, and Stillman agreed that they should seek the advice of legal counsel regarding how properly to raise their concerns and fulfill their obligations.  They decided to seek the counsel of Ditto's outside counsel, Katten Muchin Rosenman LLP ("Katten").  On September 4, 2013 Simons contacted James Van De Graaff, an attorney at Katten, to apprise him of the situation and seek his firm's counsel.  Simons made it clear to Van De Graaff that he was seeking counsel on behalf of Ditto and not on behalf of himself (or Mann or Stillman) personally.  Van De Graaff informed Simons that he and the other officers should obtain independent outside counsel to advise them regarding their concerns and provided a referral.

51.     Simons, Mann, and Stillman, at their own expense, proceeded to retain the law firm of Shulman Rodgers ("Shulman"), a law firm referral obtained by Stillman, to provide them with legal advice.

## Fox Becomes Suspicious of the Inquiry into His Activities

52.     At the beginning of September 2013, Fox appeared to become suspicious of Simons', Stillman's and Mann's ongoing inquiries.

53.     On September 6, 2013 Fox emailed Simons to confirm the investor meeting previously scheduled for the following week, September 12, 2013, on Martha's Vineyard. Fox indicated in the email he was planning to bring his two sons along for the trip.  After Simons questioned whether or not his sons would be travelling at the company's expense, Fox began frantically texting Mann demanding to know what Simons might know or have seen regarding Fox's spending history, and asking if there was "something up" with him.

**The Board Demand Letter and the Company's Hostile Response**

54.     On Monday, September 9, 2013, acting on the advice of counsel, Simons delivered a letter to the Board of Ditto Holdings relating to their concerns (the "Board Action Demand Letter").  The Board Action Demand Letter was delivered at approximately 10:30 am to Board Members Rosenberg and Fox, as well as to General Counsel and Secretary Cohn. The Board Action Demand Letter brought to the Board's attention some of the financial irregularities described above, and requested a special meeting of the Board to adopt nine proposed resolutions relating to the issues raised.  The Board Action Demand Letter also stated that Simons would notify government authorities about his concerns if and when such notification became necessary and appropriate.

55.     The first response to the Board Action Demand Letter came approximately two hours later when Rosenberg and Cohn entered Simons' s office and Rosenberg demanded that Simons vacate the premises on the basis that "it's best that the person making these allegations not be in the office."  There was no discussion of any information contained in the Board Action Demand Letter, nor did Rosenberg offer Simons any explanation, context, or other justification for his actions or for ignoring the Board Action Demand Letter.

**Notification of the SEC**

56.     Based on this immediate and hostile first response, Simons became concerned that Ditto might be preparing to retaliate against him and could be attempting to cover up past or continuing malfeasance.  Simons, Mann and Stillman related these concerns to Shulman. Shulman advised that at this point it was appropriate and necessary immediately to bring the matter to the attention of SEC to ensure that any improper conduct could not be covered up and to prevent any potential ongoing harm to shareholders.

57.     At approximately 3:30 p.m. that same day, September 9, 2013, one of the Shulman lawyers sent an email to the Acting Director and Deputy Director of the Chicago office of the SEC, making the SEC aware of the possible securities violations and attaching a copy of the Board Action Demand Letter.  The email to the SEC stated that information in the Board Action Demand Letter was "substantive and well-documented" and raised "serious questions as to whether Mr. Fox and certain others involved in senior management have perpetrated or are in the process of perpetrating a fraud on Ditto Holdings' shareholders. …"

### Simons' Termination from Ditto Trade and "Leave" from Ditto Holdings

58.     At approximately 8:30 a.m. the next morning, September 10, 2013, Fox sent Simons an email stating that Simons was "no longer permitted in the Chicago office until further notice."  Fox attached two letters, one from Ditto Trade and one from Ditto Holdings, both signed by Fox.

59.     The first letter stated that "the Board of Directors of Ditto Trade, Inc. (the Company) has relieved you of your role and any offices, with the Company.  This does not affect your role with Ditto Holdings, Inc. nor your compensation."  The sole reason stated in the letter for this action was Simons' purported "failure to have taken and passed the principal's exam administered by FINRA."  The letter did not mention any other factors that went into the termination decision.

60.     The second letter purported to place Simons on "indefinite paid leave" from Ditto Holdings.  The sole reason stated for this action was that:  "[b]ecause you have occupied a business development role for Ditto Holdings, Inc. (the Company), which responsibilities current circumstances make it not feasible for you to carry out, I think it best

that you take a hiatus from the Company." Fox did not mention any other factors that went into the decision to place Simons on leave from his Officer position with Ditto Holdings.

61.     As of September 10, 2013, all of Simons' email accounts had been deactivated, with no further information or contact information available; the locks to Ditto offices were changed; and Simons' access to the building was revoked.'

62.     On the evening of September 10, 2013, Ditto's counsel requested (through Shulman) that Simons consider agreeing to sign a unanimous consent by the Board of Directors to adopt resolutions as requested in the Board Action Demand Letter in lieu of the Special Meeting of the Board, which the Board Action Demand Letter had called for to take place on September 11, 2013. Simons agreed based upon Ditto's Counsel's promise to deliver a draft for Simons' review on the morning of September 11, 2013. The Special Meeting of the Board was cancelled.

63.     On September 11, 2013, Simons became aware that Fox had been selectively contacting shareholders, disseminating false and disparaging information regarding Simons' termination, and secretly soliciting votes for a shareholder consent to remove Simons from the three-person Board and replace him with a new Board member of Fox's choosing.

64.     On September 11, 2013, Ditto's Counsel failed to provide any draft resolutions as promised, the Special Meeting of the Board had been cancelled, and it appeared that the only process under way was to remove Simons from the Board, rather than to address the serious issues Simons had raised.

65.     On the evening of September 15, 2013, Cohn notified Simons by email that Simons had been removed from the Board of Ditto Holdings by a vote of a majority of shareholders. The shareholders had been notified as well, a few moments earlier, that a

majority of shareholders had purportedly voted in favor of Fox's recommended replacement for Simons.

66.     Simons' removal from the Board of Directors was without "cause" under the Ditto Bylaws.  There was no mention of "cause" associated with the removal.

**Fox and the Ditto Entities Make Statements Disparaging Simons**

67.     Immediately following Simons' termination on September 10, 2013 Fox held a meeting with all Ditto employees in the Chicago office at which he announced Simons' termination, attributing it to Simons having "regulatory issues."  Fox further stated that the "lawyers forced our hand," implying that Simons had been removed for improper or illegal conduct.  This led to inquiries by employees and shareholders trying to understand the circumstances behind Simons' removal.  At no time during the open meeting did Fox mention the Board Action Demand Letter or that there was any pending Board inquiry into irregularities in the Ditto Entities' financial records.

68.     On information and belief, immediately following Simons' termination on September 10, 2013, Fox held one-on-one closed door meetings with Ditto employees at which he disparaged Simons, and offered them cash bonuses and salary increases in exchange for their loyalty and their silence.

69.      Fox then sent a letter on September 11, 2013, to all shareholders, including members of Simons' family and influential members of his professional network, in which he suggested that Simons' account of the facts was untrue and stated that "not all hires work out." Fox's statements implied deceit or dishonesty by Simons.

70.     On September 17, 2013, Fox held another meeting for all employees in the Chicago office at which he announced that Ditto Holdings had filed a lawsuit against Simons

(discussed below). Fox shared the contents of the lawsuit with employees and told them that as punishment for Simons trying to "torpedo" Ditto, he would "take everything that he fucking has and make his wife cry."

71.     On information and belief, on October 24, 2013, after firing Jeremy Mann for his role in investigating and reporting Fox's alleged malfeasance (and his refusal to retract his report), Fox held a conference call to address employee concerns. On that call, Fox blamed the low morale at Ditto on Simons, stating that he blamed Simons for everything. Fox also stated made a statement to the effect that Simons was "not of the upstanding character as we had hoped or expected." Fox continued to disparage Simons until, according to one employee, "it became awkward."

72.     By intentionally making false and misleading disparaging statements about Simons to Ditto Board Members, shareholders, employees, and others, Fox damaged Simons' professional reputation, attacked Simons' integrity, cast doubt on Simons' ability to perform his job, and suggested Simons had run afoul of regulators. Despite having no basis, Fox's disparaging comments have harmed Simons' reputation in the financial services and securities trading industry.

### Ditto Sues Simons for and Purports to Terminate Simons "For Cause"

73.     On Tuesday, September 17, 2013 – roughly a week after Simons delivered the Board Action Demand Letter and reported financial concerns to the SEC – Ditto Holdings filed the Cook County Lawsuit against Simons. The Cook County Lawsuit, captioned *Ditto Holdings, Inc. v. Paul Simons et al.*, Case. No. 2013 L 010424, remains pending in the Circuit Court of Cook County and alleges breach of fiduciary duty and breach of contract. Ditto specifically alleged as a basis for its claims that "Simons reached out to government

21

authorities" to report his concerns about financial improprieties. Each of the two counts of the complaint demanded damages of $20 million.

74.     Shortly after Ditto Holdings filed the Cook County Lawsuit on September 17, 2013, Simons received an email from Fox notifying him that he had been terminated from his position as Executive Vice President of Ditto Holdings, this time ostensibly for "cause." This termination occurred just five business days after Fox had terminated Simons' employment with Ditto Trade purportedly for reasons that did not constitute "cause" (as defined in the Confidentiality Agreement).

75.     The September 17, 2013 notification stated: "At a meeting held on September 16, 2013, the board of directors of Ditto Holdings, Inc. (the "Company") approved the termination of your employment as Executive Vice President of the Company for 'cause' (as such term is defined in the Confidentiality, Intellectual Property and Non-Competition Agreement between you and the Company dated as of January 2, 2013), effective immediately."

76.     The September 17, 2013 notification further stated that "you have gained access without proper authorization to a list of the Company's stockholders and misused that information to contact the Company's stockholders to disseminate unverified information regarding the Company." Simons never gained unauthorized access to a list of company stockholders, nor did he ever disseminate unverified information. The only communication Simons made to shareholders was on September 11, 2013. Simons communicated with the shareholders in his capacity as a Board member, and disclosed nothing confidential, untrue or unverified.

77.     Moreover, none of the alleged activities cited in the September 17, 2013 notification would have (even if they occurred) satisfied the definition of "cause" set forth in the Confidentiality Agreement.

78.     Pursuant to SEC Rule 17 C.F.R. 240.21F-17, "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement."  Ditto's efforts to wield the Confidentiality Agreement on September 17, 2013, both in the Cook County Lawsuit and in  its "for cause" determination, were unlawful actions intended to interfere with Simons' ability to continue to communicate with the SEC about possible securities law violations.

79.     On the evening of September 17, 2013, Fox demanded that Mann retract his support for and participation in the Board Action Demand Letter, drop any legal actions he was contemplating, turn over any documents he had provided to Simons, and support Fox's position against Simons.  When Mann refused to do so, he was sent home and told he no longer had access to the office.  His responsibilities at the Ditto Holdings were diminished. On October 23, 2013, both Mann and his brother Stephen, a programmer with Ditto Trade, were terminated.

80.     The same day, on information and belief, Fox made similar demands of Adam Stillman.  When Stillman refused, he was demoted in title and pay and his stock options were reduced.  Ditto Holdings has now added Mann as a defendant in the Cook County Lawsuit.

### Misrepresentations by Fox and Ditto

81.     Simons' examination of Ditto records during late-August and September 2013 also revealed that throughout Simons' tenure at Ditto Trade and before, Fox had altered,

ordered to be altered, or otherwise misrepresented or concealed material information regarding Ditto and its financial condition.

82.     Fox's false and misleading representations included statements and information on which Simons had relied in accepting Fox's offer of employment in December 2012, and in gauging the present and potential future value of his securities-based compensation package.

83.     On or about December 12, 2012, at a meeting in Los Angeles during which Fox and Simons explored the possibility of Simons joining Ditto rather than utilizing Ditto as a vendor,  Fox made materially false and misleading statements to Simons in order to induce him to Ditto.  These statements related to the past and present financial performance and condition of Ditto, the number of and nature of certain partnerships and vendor relationships, and Fox's prior experience and successes.  During the meeting and in follow up communications, Fox presented revenues dramatically higher than those reflected in various company filings.  Likewise, the expense figures Fox provided were vastly understated compared to the expenditure records Simons discovered when he examined Ditto's records in August 2013.  Fox intended for Simons to believe that the financial statements were true in order to induce him into accepting a position with Ditto and compensation consisting almost entirely of equity.

84.     Among the misrepresentations he made, Fox overstated Ditto's investment in technology, development, and regulatory approvals since 2009 including in a written company executive summary ("Executive Summary").  The Executive Summary stated that "over $5 million has been invested in technology, regulatory approval, and operational development."  Simons discovered in August 2013 that more than $1 million of Ditto's

spending in 2012 alone did not constitute investments in "technology, regulatory approval, and operational development." Given that Ditto had only raised a total of approximately $5.1 million through 2012 (according to the Ditto Holdings Capitalization Table Fox sent Simons via email on December 18, 2012), the amount actually invested was substantially and materially less than $5 million.

85. The Executive Summary, provided to Simons by Fox on or about December 12, 2012, and dated October 2012, states:

> Ditto Holdings' technology allows it to extend trading opportunities to these Facebook and Twitter centric companies. Ditto Holdings has entered into several key partnerships and is negotiating several more whereby these Social Investing companies can monetize their user base by connecting their technology to Ditto Trade. This allows Ditto Trade to acquire a significant number of customers at zero cost. These partnerships are expected to have a substantial impact on Ditto Holdings' growth and profitability.

In fact, Ditto Holdings had no such agreements or partnerships. Fox misrepresented Ditto Entities' partnerships and technology to Simons in order to make Simons believe that Ditto was much further along in becoming established in the market than they actually were. Simons believed these misrepresentations and accepted employment with Ditto in part due to them.

86. During the LA office visit on or about December 12, 2012, Fox materially overstated the number of "Lead Traders" who were active on Ditto Trade's platform, as represented by the listings on Ditto's "sister" site, Followable.com.

87. Shortly after joining Ditto, Simons commissioned an analysis of the service listings on Followable.com and noted in an email to Fox that he had discovered that of the 58 listed services, 25 were non-existent and only 3 had 12 or more "followers," representing over 80% of Ditto's business. The number of actual partners or vendors had been

substantially and materially overstated to Simons. Two senior Ditto executives told Simons

the bogus services were listed at the behest of Fox in order to convey a sense of credibility

and legitimacy for the depth and breadth of services offered by Ditto.

88.     During the LA visit on or about December 12, 2012 Fox falsely represented to

Simons that Ditto had a partnership with the Professional Golfer's Association of America

("PGA"), which would provide meaningful marketing and brand exposure for Ditto. Fox

made the same misrepresentation regarding the alleged PGA partnership, both verbally and in

writing, in various presentations to shareholders and prospective investors. Simons received

an email in September 2013 from the General Counsel of the PGA denying any such

partnership and demanding that Ditto cease to use any PGA marks and remove any reference

to the PGA from Ditto's materials.

89.     During their negotiations, Fox represented to Simons, in response to Simons'

concerns regarding barriers to potential competitors, that Ditto Trade had proprietary "patent

pending" technology. Ditto's purported proprietary technology was also highlighted in the

Executive Summary. Ditto has no such patents.

90.     On December 18, 2012, following Simons' visit with Fox in Los Angeles and

his subsequent offer of employment, Simons requested various company documents and

other information. In response, on December 18, 2012 Fox sent Simons a document (along

with others) entitled Ditto Holdings, Inc. Consolidated Income Statement.

91.     The Consolidated Income Statement overstated Ditto's revenues by a factor of

four. The Consolidated Income Statement indicated Ditto Holdings quarterly 2012 revenues

(transactions, commissions, interest and other) were as follows: Q1: $220,844; Q2: $237,544;

Q3: $144,140; and Q4: $445,474 (projected as of December 18, 2012). The Consolidated

Income Statement indicated that full year 2012 revenues were $1,048,002 (projected as of December 18, 2012). During the course of the August 2013 examination of Ditto's financial records, Simons discovered that the actual revenue figures as reported in SEC Form X-17A-5 (FOCUS) Filings were as follows: Q1: $52,327; Q2: $44,530; Q3: $80,806; and Q4: $75,746. Full year 2012 revenues were $253,409.

92. The financial information that Fox presented to Simons also dramatically understated Ditto's expenses. The information indicated that Ditto had spent $145,000 in "Travel/Entertainment/Auto." The Ditto Trade 2012 FOCUS report filed with the SEC indicates $482,765 in Meals and Entertainment, which represented only that portion of Ditto Holdings' expenses paid by the subsidiary Ditto Trade.

93. Fox intended the false and misleading statements to lead Simons to believe that Ditto was on solid financial footing and that it was run in a financially responsible manner, and not as a piggy bank for Fox and his family and close friends. These statements induced Simons into accepting employment with Ditto and an equity-based compensation package.

94. Additionally, throughout the various meetings and conversations between Fox and Simons in December 2012, Fox represented that a critical element of Ditto's unique business model and its ability to maintain regulatory approval was its "arm's length" relationship with Lead Traders. Their independence and lack of affiliation with Ditto Trade, a regulated Broker Dealer, was a key to the approvals Ditto had received.

95. Simons later discovered that, in fact, many of the relationships with Lead Traders were anything but "arm's length." For example, one of the Lead Traders was an entity whose sole principal was the son of an officer of Ditto, was a shareholder in Ditto, and

27

had received a loan from Ditto.  In 2013, this individual was charged by the SEC for operating a Ponzi scheme fraud using the same entity that was a Lead Trader service on Ditto. Furthermore, a Lead Trader who represented the largest following and accounted for a substantial portion of Ditto's total revenues was also a shareholder of Ditto, had arranged seminars to solicit investors in Ditto, was compensated by Ditto as a "finder," "consultant," or "joint venture party" (both by Fox personally and Ditto),  had been granted a substantial number of warrants (over 700,000) in Ditto, and had been denied registration by one or more regulatory agencies.

96.    All of these false and misleading misrepresentations and omissions were material to Simons' assessment of the value and potential of Ditto.  Simons relied on these representations and omissions in deciding to accept and continue employment with Ditto based on a predominantly equity-based compensation package.

### The Stated Reason for Simons' Termination and Removal Was a Pretext

97.    In the September 10, 2013 termination letter, the sole reason cited for Simons' termination from Ditto Trade was Simons' purported failure to take the Series 23 exam.  The issue of the FINRA examination had never been raised with Simons in the context of an adverse employment action.  This reason was pretext.

98.    Paragraph 5 of the December 19, 2012 Employment Letter from Ditto Trade to Simons states "You [Simons] will maintain your current brokerage industry licenses and will obtain any additional licenses necessary to your duties as CEO, as mutually agreed." The letter did not set a time frame for obtaining any required license.

99.    The "as mutually agreed" language was included in the Employment Letter because the parties were uncertain as to whether Simons needed any further registrations due

to the fact that he had maintained and would transfer all the licenses and registrations he had held in his prior positions. The question was later settled in early June when it was determined that based on his existing registrations Simons was eligible for the Series 23, a considerably less onerous path to the same "General Securities Principal" designation.

100. At no time during Simons' tenure at Ditto Trade did he have any direct communication from FINRA regarding his registration status. Simons was informed by Mann that during FINRA's annual audit of Ditto Trade in February 2013, there was never any mention of, nor did FINRA raise any concerns about, Simons' registration. On March 8, 2013 Fox wrote to the officers of Ditto Trade "I could not be happier about today's FINRA Exit Meeting" and went on to extend "kudos to Paul for helping to fill the pipeline!"

101. On August 26, 2013 Simons sent Fox a copy of his registration to sit for the Series 23 exam on September 18, 2013. Thereafter, Fox said nothing further to Simons about the issue of his FINRA registration until the termination letter of September 10, 2013.

102. Simons was not required to have Registered Principal status or any other license for his position as Executive Vice President of Ditto Holdings.

103. Ditto filed a U5 with FINRA indicating Simons had been terminated for failing to obtain his license. Ditto did not provide, as is required by FINRA, a simultaneous notice of the U5 filing to Simons and only provided the notice when Simons requested it after having been notified of his termination.

104. A U5 designation of involuntary termination is irrevocable, and has material implications for someone with Simons' executive level credentials in gaining future employment at a comparable level.

105.    When terminating Simons' employment on September 10, 2013 for the stated reason of "your failure to have taken and passed the principal's exam administered by FINRA," the reason given was pretext and does not, in any case, meet the criteria for "cause" set forth in the Confidentiality Agreement.

### Ditto's Denial of Simons' Fully Vested Warrants

106.    On September 24, 2013, following his abrupt termination, Simons submitted his executed Notice of Warrant Exercise, which was attached to his May 1, 2013 fully vested Warrant Grant, to Cohn, Ditto Holdings' General Counsel.  Prior to sending payment, Simons asked for confirmation of receipt.

107.    In response Cohn stated, "We received your 'Notice of Exercise' Thursday night; however we have no record of such an agreement between you and the Company." Cohn directed Simons to outside counsel, Katten, but Katten never responded to Simons' inquiry.  As a result, Simons has effectively been denied the right to exercise the fully vested warrants granted to him.  On information and belief, Simons' right to exercise his fully vested warrants was denied in retaliation for reporting alleged misconduct to the SEC and to Ditto Holdings' Board and in an effort to intimidate and  prevent him from any further disclosures to regulators, law enforcement, or shareholders.

108.    In addition to the warrants, Simons was entitled under the Restricted Stock Grant to a grant of 250,000 shares on the date of his termination.  He did not receive these shares.

109.    Simons was also entitled to immediate vesting of options to purchase at least 375,000 shares subject to the Stock Option Grant Notice at an exercise price of $.70.

30

**Ditto's Failure to Pay Simons Agreed-Upon Wages and Reimburse His Benefits**

110.     Simons has also not been paid his salary for the full thirty-six weeks during which he was employed with Ditto Trade.  He is owed an amount of $13,846.22 for this unpaid salary.  In addition, Ditto Trade improperly withheld Illinois taxes from the amounts Simons was paid.

111.     Ditto Holdings stopped paying for the corporate apartment Simons rented at Unit 1105 at 8 East Randolph Street, Chicago, Illinois as of October 2013.  Despite Ditto's undertaking to reimburse all of Simons' Chicago travel expenses, Simons has been left with personal liability on the lease he undertook at Ditto's direction and with Fox's full knowledge.

112.     As a result of his unlawful termination, Simons has been forced to procure his own health insurance at considerable expense.  Prior to terminating Simons, Ditto was providing Simons and his family of five with healthcare benefits.

**Fox Is Liable Under the Veil Piercing and Alter Ego Doctrines**

113.     Despite the formal governance structure and procedures set forth in the Ditto Holdings bylaws, both Ditto Entities are pervasively controlled by Fox, who has effectively usurped the powers belonging to the Board of Directors and shareholders in order to perpetrate the wrongful conduct alleged herein and to cover up his alleged malfeasance and securities violations.

114.     For example, the Ditto Holdings bylaws prescribe a process for the Board to elect corporate officers.  Notwithstanding that process, on information and belief, Fox appoints all officers personally.  The Board was not involved in selecting, negotiating with, hiring and installing Simons as CEO of Ditto Trade or as an Executive Vice President of Ditto Holdings.

31

115.    The bylaws of Ditto Holdings require that the Board meet at least annually immediately following the annual shareholder meeting. No such meeting occurred following the 2013 Annual Shareholder meeting on July 24, 2013.  On information and belief, Ditto Holdings never holds required annual Board meetings.

116.    During Simons' tenure in 2013, not a single document, shareholder update, or resolution of any kind was issued by or on behalf of the Board of Directors.

117.    On information and belief, other than the termination notices signed by Fox and attributed to the Board, the Board has never issued a single document, shareholder update, or resolution of any kind.

118.    Fox purports to hold the titles of CEO and Chairman of Ditto Holdings, but neither of those roles exists according to Ditto Holdings' bylaws, nor was Fox ever elected or appointed to those positions by the Ditto Holdings Board.

119.    Ditto Holdings does not follow a formal process for issuing stock or granting warrants, stock, and options.  The corporation does these acts at Fox's whim, in his sole discretion.

120.    Ditto does not have an official reporting structure, does not conduct performance reviews, and does not maintain a bonus pool or option pool.  All employees report to Fox, and Fox determines compensation, disseminates bonuses at his own discretion, and grants and takes away stock an options at his discretion.

121.    Rather than properly notifying and involving all of Ditto Holdings' shareholders in Simons' removal from the Board, Fox sent shareholder consent forms only to a hand-picked group of shareholders effectively controlled by or whose votes were pre-arranged by Fox.  These shareholders received the consent forms on a Sunday afternoon and

had approved of the removal by that Sunday evening. On information and belief, there was no deliberative process, many shareholders were provided no advance notification of the vote, and the shareholders Fox did contact were given incomplete and false information.

122. Fox represented in the September 10, 2013 letter that Simons was terminated from Ditto Trade by the Board of Directors of Ditto Trade. However, as CEO of Ditto Trade, Simons never knew of the existence of a Ditto Trade Board. On information and belief, Fox made the decision to terminate Simons from Ditto Trade and to place Simons on "leave" from Ditto Holdings on his own.

123. Simons joined Ditto believing the Ditto entities would be governed according to their bylaws by functioning Boards of Directors with proper corporate formalities. Fox's pervasive control of Ditto has permitted him to effectively by-pass the deliberative and decision-making functions of the Board and the shareholders in order to cover up his improper conduct by terminating Simons, disseminating his false narrative against Simons, and preventing Simons from disclosing the truth.

124. Fox used his pervasive control of Ditto to abuse the corporate structure and engage in the wrongful conduct alleged herein solely for his personal benefit. It would be unjust and inequitable to permit Fox to use the corporate form to shield himself from liability for the acts alleged herein. Simons should therefore be permitted to pursue recovery of his damages from Fox personally, as well as from Ditto.

### Simons' Damages Resulting from Defendants' Wrongful Conduct

125. As a direct and proximate result of Defendants' wrongful conduct, Simons has suffered substantial damages, including (but not limited to) the following:

33

- Loss of the benefits of options, warrants and restricted stock that Simons was entitled to receive;

- Loss of income and benefits after termination;

- Underpayment of agreed compensation and benefits prior to termination;

- Costs associated with loss of health benefits and accumulated deductible and out-of-pocket expenses

- Loss of opportunity to now pursue lucrative alternative employment or entrepreneurial activities;

- Opportunity cost of sharing his own ideas and strategies with Ditto instead of using them for his own venture;

- Costs and expenses in connection with the Cook County Lawsuit and obtaining advice regarding the reporting of Defendants' misconduct;

- Damage to Simons' professional and personal reputation; and

- Emotional distress.

126.    Simons has been damaged in an amount in excess of $10 million.

## COUNT I

### RETALIATION IN VIOLATION OF THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, 15 USC § 78u–6

#### AGAINST ALL DEFENDANTS

127.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

128.    Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u–6, "no employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and

conditions of employment because of any lawful act done by the whistleblower – (i) in providing information to the Commission in accordance with this section…."

129.    As alleged herein, Simons reported what he believed were likely securities law violations committed by Ditto and Fox to the Securities and Exchange Commission on September 9, 2013.

130.    Reporting securities violations and providing information to the SEC is a protected activity under Dodd-Frank.

131.    Simons was discharged, suspended, threatened, harassed and/or otherwise discriminated against because of, and in retaliation for, his lawful conduct in providing (and threatening to provide) information to the SEC.

132.    In the course of engaging in the retaliatory conduct alleged herein, Fox has pervasively controlled and used Ditto as an alter ego and instrumentality solely to serve his own interests, as alleged herein.  Fox is liable along with Ditto for Simons' damages resulting from this conduct under the doctrines of alter ego and/or veil piercing.

WHEREFORE, Simons requests that the Court enter judgment in his favor on Count I and against Defendants in an amount to be determined at trial, including:  back pay at two times the amount otherwise owed to Simons, plus interest; reinstatement with the same seniority status that Simons would have had, but for the violation; compensation for litigation costs, expert witness fees, and reasonable attorneys' fees.  Simons seeks any further relief deemed just and proper.

## COUNT II

## RETALIATION – ILLINOIS COMMON LAW

### AGAINST ALL DEFENDANTS

133.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

134.    Simons was terminated from Ditto Trade, discharged from his Executive Vice President role at Ditto Holdings, removed from the Ditto Holdings Board, denied options, warrants and stock, and otherwise discriminated against in the terms and conditions of his employment, in retaliation for truthfully reporting financial irregularities and possible securities violations by Ditto and Fox to the Board of Directors of Ditto Holdings, and to the SEC, in violation of Illinois law.

135.    Simons' discharge and the other retaliatory actions taken against him violated a clearly mandated public policy of the State of Illinois – protection of persons for reporting or threatened reporting of illegal or improper conduct.

136.    As a direct and proximate cause of his termination and other adverse employment actions by Defendants, Simons has been damaged.

137.    By terminating Simons in retaliation for engaging in protected activity, Defendants acted willfully, maliciously, and intentionally, in violation of Illinois law.

138.    In the course of engaging in the conduct alleged herein, Fox has pervasively controlled and used Ditto as an instrumentality solely to serve his own interests.  Fox is liable along with Ditto for Simons' damages resulting from this conduct under the doctrines of alter ego and/or veil piercing.

WHEREFORE, Plaintiff  prays for entry of a judgment by this Court on Count II against Defendants in an amount to be determined at trial for compensatory damages,

emotional distress damages, punitive damages, and the attorneys' fees and costs of this action and requests that this Court award such other relief as is deemed just and proper.

## COUNT III

### RETALIATION – VIOLATION OF THE WHISTLEBLOWER ACT, 740 ILCS 174

#### AGAINST ALL DEFENDANTS

139.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

140.     The Illinois Whistleblower Act makes it unlawful to "retaliate against an employee for disclosing information to a government or law enforcement agency."

141.     Simons was terminated from Ditto Trade, discharged from his Executive Vice President role at Ditto Holdings and removed from the Ditto Holdings Board in retaliation for truthfully reporting financial concerns and possible securities law violations by Ditto and Fox to the Board of Directors of Ditto Holdings, and to the SEC, in violation of Illinois law.

142.     Simons' discharge and the other retaliatory actions taken against him violated a clearly mandated public policy of the State of Illinois – i.e. protection of persons for reporting or threatened reporting of illegal or improper conduct.

143.     As a direct and proximate result of being terminated by Defendants, Plaintiff has been damaged.

144.     By terminating Plaintiff in retaliation for engaging in protected activity, Defendants and their agents and employees acted willfully and intentionally.

145.     In the course of engaging in the conduct alleged herein, Fox has pervasively controlled and used Ditto as an instrumentality solely to serve his own interests.  Fox is liable

along with Ditto for Simons' damages resulting from this conduct under the doctrines of alter ego and/or veil piercing.

WHEREFORE, Plaintiff prays for entry of a judgment by this Court on Count III against Defendants for reinstatement with the same seniority status that Simons would have had, but for the violation; back pay, with interest; compensation for any damages alleged as a result of Defendants' violation, including litigation costs, expert witness fees, and reasonable attorney's fees; and any further relief deemed just and proper.

## COUNT IV

## FRAUD

### AGAINST ALL DEFENDANTS

146.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

147.    Defendants made false or misleading statements of material fact and material omissions in the course of recruiting Simons to join Ditto and accept equity compensation, as alleged above.

148.    Defendants were aware that their statements, omissions, and the information provided to Simons, were materially false or misleading.

149.    Defendants intended that their statements, omissions, and the information they provided to Simons, would induce Simons to accept positions with Ditto or otherwise act in reliance on them.

150.    In accepting and retaining his positions with Ditto, and foregoing other opportunities, Simons acted in reliance on Defendants' false and misleading statements, omissions, and information.

151.     As a direct and proximate result of his reliance on Defendants' false or misleading statements, omissions, and information, Simons has suffered substantial damages.

152.     In the course of engaging in the conduct alleged herein, Fox has pervasively controlled and used Ditto as an instrumentality solely to serve his own interests, as alleged herein.  Fox is liable along with Ditto for Simons' damages resulting from this conduct under the doctrines of alter ego and/or veil piercing.

WHEREFORE, Plaintiff prays for entry of a judgment by this Court against Defendants for compensatory and punitive damages, and such other relief as is deemed just and proper.

## COUNT V

## VIOLATION OF SECTIONS 10(b) AND RULE 10b-5

### AGAINST ALL DEFENDANTS

153.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 and 146 through 152 as though fully set forth herein.

154.     This Count is brought under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78t(a), and Securities and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

155.     Defendants made material false or misleading statements (and provided false or misleading information) to Simons in connection with negotiating compensation packages that, in large part, consisted of securities.

156.     As the securities were not earned, acquired or granted pursuant to an incentive-based plan but constituted the primary consideration in lieu of income in exchange for Simons' services, the fraud alleged herein involved a "sale" of securities by Fox.

157.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or a course of business that operated as a fraud or deceit upon Simons.

158.    Simons relied on Defendants' false or misleading statements in determining to become involved with Ditto and to accept the securities offered to him in return for his services.  Simons would not have become involved with Ditto, or would have accepted the securities on different terms, if not for Defendants' false and misleading statements and information.

159.    Defendants knew or deliberately disregarded that the statements and information were false and misleading, as alleged herein.

160.    Because of Defendants' false or misleading statements or information, the securities offered to Simons to induce him to accept employment and provide services were worth less than Simons was led to believe.

161.    As a direct and proximate result of Defendants' wrongful conduct, Simons has suffered damages.

WHEREFORE, Plaintiff  requests that this Court enter judgment in his favor and against Defendants on Count V and award compensatory damages, prejudgment interest, as well as costs and expenses incurred in this litigation, and such other relief as is allowed by law or deemed just and proper.

## COUNT VI

### SECTION 20(a) LIABILITY

#### AGAINST JOSEPH FOX

162.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 and 153 through 161 as though fully set forth herein.

163.    Fox acted as a controlling person of Ditto within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  Fox had the power and authority to cause Ditto to engage in the wrongful conduct alleged in Count V.

164.     By reason of such conduct, Fox is liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff  requests that this Court enter judgment in his favor and against Fox on Count VI and award compensatory damages, prejudgment interest, as well as costs and expenses incurred in this litigation, and such other relief as is allowed by law or deemed just and proper.

## COUNT VII

### VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820 ILCS 115

#### AGAINST ALL DEFENDANTS

165.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

166.    Simons entered into the Letter Agreement with Ditto Trade on December 19, 2012.  Pursuant to that Letter Agreement, Simons was employed by Ditto Trade, and Ditto Trade was to pay Simons an annual salary of $120,000.  Under this arrangement, Simons

41

should have received bi-weekly gross pay in the amount of $4,615.38 throughout the time he was employed.

167.    Simons worked for a total of 36 weeks but was only paid for 30 weeks. Simons was underpaid by $13,846.22.

168.    The salary payments that Defendants owe to Simons are "wages" and "final compensation," as those terms are defined in Section 2 of the Illinois Wage Payment and Collection Act (820 ILCS 115/2).

169.    The Illinois Wage Payment and Collection Act required Ditto to pay the salary Simons was owed at least once a month under 820 ILCS 115/3, but no later than the next regularly scheduled pay day following termination of Simons' employment.

170.    Also, pursuant to the Employment Letter, Ditto Trade was to pay Simons a "bonus in an amount to be determined by a mutually determined formula tied to overall company results."  Based on his success at Ditto and the company results, Simons is due a bonus based on a mutually determined formula.  Simons was never paid such a bonus, nor did Ditto and Simons ever discuss the methodology for determining the bonus.

171.    Simons is also owed all equity compensation not yet paid to him by Ditto, as alleged herein.

172.    Fox (on behalf of Ditto) stated in an email on May 17, 2013 that he would provide Simons with a bonus sufficient to cover the cost of exercising the warrants in the Warrant Grant.  Neither Fox nor Ditto provided Simons with that bonus.

173.    Defendants have wrongfully withheld Simons' benefits, including, but not limited to, his health insurance benefits and reimbursement of the cost of the lease that Simons took on to provide housing in Chicago.

174. In failing to pay Simons the wages, benefits, and final compensation due to him, Ditto violated the Illinois Wage Payment and Collection Act.

175. Fox is an officer of Ditto Holdings and is responsible for the payment of wages and final compensation to Ditto Trade employees, including Simons. Fox knowingly permitted Ditto to violate the Illinois Wage Payment and Collection Act.

176. Fox is therefore Simons' "employer" for purposes of the Illinois Wage Payment and Collection Act, and is jointly and severally liable for payment of wages and final compensation to Simons.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendants on Count VII and award Plaintiff his unpaid wages and benefits, statutory damages, costs and reasonable attorney's fees, and such other relief as is deemed just and proper.

## COUNT VIII

### BREACH OF CONTRACT: STOCK OPTION AGREEMENT

#### AGAINST DITTO HOLDINGS AND DITTO TRADE

177. Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

178. As part of his compensation package, pursuant to the Employment Letter issued by Ditto Trade and the accompanying Stock Option Grant Notice issued by Ditto Holdings dated January 2, 2013, Ditto granted Simons 1,500,000 options to purchase shares of Ditto Holdings at an exercise price of $.70 per share, subject to the vesting requirements of the accompanying Stock Option Agreement.

179. The Stock Option Agreement provided that, if Simons was terminated "without cause" on or after July 2, 2013 but before January 2, 2014, the option for Simons to purchase 375,000 shares would vest. It further provided that if he was terminated without cause on or after January 2, 2014 but before January 2, 2015, his option to purchase another 375,000 (for a total of 750,000) would vest. Further, the 375,000 shares subject to the option would vest on each of the two remaining successive anniversaries (January 2, 2015 and January 2, 2016), for a total of 1,500,000 shares.

180. The Stock Option Grant Notice and the Stock Option Agreement constitute a valid and enforceable contract between Simons and Ditto Holdings.

181. Simons has substantially performed his material obligations under the contract.

182. Simons was terminated from Ditto Trade on September 10, 2013. The termination letter terminating him from that position did not state that he was terminated for cause, nor did the reason provided for terminating Simons as CEO of Ditto Trade (his alleged failure to take the Series 23 exam), constitute cause under the Confidentiality Agreement. Simons has engaged in no conduct that would provide a basis for termination for "cause."

183. Under the terms of the Stock Option Grant and Stock Option Agreement, Simons' option to purchase 375,000 shares of Ditto Holdings stock from Ditto Holdings vested, and was fully exercisable by Simons at $.70 per share, on September 10, 2013.

184. Ditto Holdings breached the contract by not granting him access to the shares. As a result of Ditto Holdings' breach, Simons has been damaged.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor against Defendant Ditto Holdings on Count VIII and award him damages in an amount to be

determined at trial, plus prejudgment interest and such other relief as the Court deems just and proper.

## COUNT IX

### BREACH OF CONTRACT:  RESTRICTED STOCK GRANT

#### AGAINST DITTO HOLDINGS

185.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

186.    Simons was granted, via the Restricted Stock Grant Notice dated August 27, 2013, 250,000 shares of common stock in Ditto Holdings, with the provision that the "restrictions shall lapse" in the event of "the termination of the holder with the Company without cause."

187.    The Restricted Stock Grant Notice is a valid and enforceable contract between Simons and Ditto Holdings.

188.    Simons has substantially performed his material obligations under the Restricted Stock Grant Notice.

189.    Simons was terminated from Ditto Trade on September 10, 2013.  The termination letter terminating him from that position did not state that he was terminated for cause, nor did the reason provided for terminating Simons as CEO of Ditto Trade (his alleged failure to take the Series 23 exam), constitute cause under the Confidentiality Agreement. Simons has engaged in no conduct that would provide a basis for termination for "cause."

190.    Under the terms of the Restricted Stock Grant Notice, Simons was entitled to immediate vesting of 250,000 shares of Ditto Holdings common stock as of the date of his termination.

191.    Ditto holdings breached the Restricted Stock Grant Notice by failing to provide Simons with his shares.  As a result of Ditto Holdings' breach, Simons has been damaged.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Ditto Holdings on Count IX and award him damages in an amount to be determined at trial plus prejudgment interest along with such other relief as the Court deems just and proper.  In the alternative, Plaintiff requests that the Court enter an order requiring specific performance of Ditto Holdings' obligation to award Plaintiff 250,000 shares of Ditto Holdings stock, along with such other relief as is deemed just and proper.

## COUNT X

### BREACH OF CONTRACT:  WARRANT GRANT

#### AGAINST DITTO HOLDINGS

192.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

193.    On May 1, 2013, Ditto Holdings terminated Simons' December 20, 2012 Consulting Agreement and granted Simons a fully vested Warrant to purchase 300,000 shares of Ditto Holdings common stock at $.05 per share.

194.    The Warrant Grant is a valid and enforceable contract between Simons and Ditto Holdings.

195.    Simons has substantially performed his material obligations under the Warrant Grant.

196.    Simons attempted to partially exercise his warrant to purchase the 300,000 shares of Ditto Holdings at $.05 per share.

46

197. Ditto Holdings breached the contract by refusing to honor the warrant and sell the shares to Simons.

198. As a result of Ditto Holdings' breach, Simons has been damaged.

WHEREFORE, Plaintiff requests that the Court to enter judgment in his favor on Count IX of his Complaint against Defendants Ditto Holdings and Ditto Trade and award him damages in an amount to be determined at trial plus prejudgment interest and such other relief as the Court deems just and proper.

## COUNT XI

### BREACH OF CONTRACT: AGREEMENT TO PAY OR REIMBURSE CHICAGO HOUSING COSTS

#### AGAINST DITTO TRADE AND DITTO HOLDINGS

199. Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

200. In conjunction with Fox's request that Simons commute to work out of and manage Ditto Trade's Chicago office, Fox (on behalf of Ditto) and Simons agreed that Ditto would pay or reimburse Simons' costs of commuting to Chicago, including the lease of a corporate apartment. The parties expected and intended that Ditto Holdings would be responsible for payment of rent liability and other costs Simons incurred as a result of the lease.

201. Simons' and Ditto's agreement constitutes a valid and enforceable contract between Simons and Ditto Holdings and/or Ditto Trade.

202. Simons has substantially performed his material obligations under the agreement.

203.     In October 2013, Ditto, in breach of the parties' agreement, stopped paying for Simons' expenses in connection with the lease and housing costs.  As a result, Simons has incurred and will incur expenses for which Ditto is responsible.

204.     Simons has been damaged as a result of the Ditto entities' failure to comply with their contractual obligations.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor on Count XI against Defendants Ditto Trade and Ditto Holdings to compensate Plaintiff for the liability and expenses he has incurred and will incur as a result of Defendants' breach, and to award Plaintiff such other relief as is deemed just and proper.

## COUNT XII

## INDEMNIFICATION

### AGAINST DITTO HOLDINGS

205.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

206.     The bylaws of Ditto Holdings provide that Ditto Holdings shall indemnify the directors and officers of Ditto Holdings in the manner and to the full extent provided by the General Corporation Law of the State of Delaware, provided the director or officer acted in good faith in a manner he reasonably believed to be in the best interests of Ditto Holdings. The bylaws further provide that the directors and officers of Ditto Holdings shall be fully protected with respect to any claims relating to actions taken or refused to be taken in reliance on the advice of counsel.

207.     Likewise, the Certificate of Incorporation of Ditto Holdings provides that officers and directors shall be indemnified to the fullest extent allowable under Delaware law

and that a director of Ditto shall not be personally liable to the corporation or its stockholders for breach of fiduciary duty as a director except for liability for (i) breach of the duty of loyalty to the corporation or its stockholders, (ii) acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law, (iii) under Section 174 of the General Corporation Law of Delaware, or (iv) for any transaction from which the director derived improper personal benefit.

208.    Ditto Holdings' undertakings in its bylaws and Certificate of Incorporation are legally enforceable by Simons.

209.    Section 145(b) of the Delaware General Corporation Law permits indemnification of a person made party to a suit by the corporation by reason of the fact that the person is or was a director or officer of the corporation, or was serving at the request of the corporation as an officer of another corporation, against expenses (including attorneys' fees) actually and reasonably incurred in connection with the defense or settlement of such suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interest of the corporation (except where the person is adjudged liable to the corporation unless the Court of Chancery or court in which the suit was brought determines the person is entitled to indemnity).  Under the Ditto Holdings bylaws and Certificate of Incorporation, Ditto Holdings is required to provide this indemnification.

210.    Simons has, with respect to all conduct at issue in the Cook County Lawsuit, acted in good faith and in a manner Simons reasonably believed to be in the best interests of Ditto Holdings.

211.    Simons was made a party to the Cook County Lawsuit by reason of the fact that he was an officer and/or director of Ditto Holdings.

212.    Simons has incurred and will incur substantial expenses and attorneys' fees defending the Cook County Lawsuit. Simons is entitled to be indemnified by Ditto Holdings for any amount paid to settle the Cook County Lawsuit or to satisfy a judgment in the Cook County Lawsuit.

213.    In the course of engaging in the conduct alleged herein, including bringing the Cook County Lawsuit, Fox has pervasively controlled and used Ditto as an instrumentality solely to serve his own interests, as alleged herein. Fox is liable along with Ditto for Simons' damages resulting from this conduct under the doctrines of alter ego and/or veil piercing.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count XII against Ditto Holdings and Joseph Fox, order that Ditto Holdings and Joseph Fox indemnify Plaintiff for expenses (including attorneys' fees), judgments, fines, settlements and amounts already paid or that Plaintiff will pay in the future in connection with the Cook County Lawsuit, and award such other relief as is deemed just and proper.

## COUNT XIII

### DEFAMATION

#### AGAINST JOSEPH FOX

214.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

215.    In connection with and after terminating Simons, Fox made false and misleading statements to Ditto Board members, shareholders, and employees in emails and verbally, indicating that Simons had "regulatory issues" and that "the lawyers" had forced him to terminate Simons.

216.     Fox's statements suggested poor performance and a lack of integrity in Simons' discharge of his duties.  Fox's statements have harmed Simon's reputation in the industry and prejudiced his future career prospects.

217.     Fox was acting in his own self-interest when he made the statements disparaging Simons in an attempt to protect himself from and cover up his own wrongdoing.

218.     Fox acted willfully and with malice and intent to harm Simons in making false accusations about him.

219.     As a result of Fox's defamatory statements about Simons, Simons suffered damages including humiliation, emotional distress, mental anguish, embarrassment, loss of reputation and loss of future earning capacity.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor on Count XIII of his Complaint against Defendant Joseph Fox in an amount to be determined at trial including compensatory and punitive damages, and any further relief deemed just and proper.

## COUNT XIV

### DECLARATORY RELIEF

#### AGAINST DITTO HOLDINGS AND DITTO TRADE

220.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 126 as though fully set forth herein.

221.     Under the Confidentiality Agreement, "cause" is defined as "(i) misappropriation of property of the Company; (ii) conviction of, or pleading *nolo contendere* to, any felony or an offense involving moral turpitude under federal, state or local laws, regulations or ordinances, (iii) dishonesty, fraud, theft or embezzlement; or (iv) a material

breach of any of the terms of this Agreement, after notice and expiration of a reasonable cure period in the case of a breach that does not fall within clauses (i), (ii), or (iii) above."

222.    Simons was not terminated from either of the Ditto entities for "cause." Ditto did not purport to terminate Simons from Ditto Trade for "cause." Simons' letter for Ditto Holdings purports to terminate him for "cause." However, Simons did not engage in the conduct alleged in the Ditto Holdings termination letter delivered to him on September 17, 2013. And, in any case, the reasons given for Simons' termination from Ditto Holdings do not satisfy the requirements for termination for "cause" under the Confidentiality Agreement.

223.    There exists an actual and immediate controversy between Ditto and Plaintiff Paul Simons because Ditto purports to have terminated Simons for "cause" and Simons contends that his termination could not have been for "cause."

224.    Among other things, a termination for "cause" may be construed to trigger the non-compete provisions of the Confidentiality Agreement. The Confidentiality Agreement states, with respect to non-competition and non-solicitation, that the clauses governing those topics "shall not apply" if the "employment or engagement is terminated by the Company without cause." A termination for "cause" purports to require (among other things) the employee to not, for a period of eighteen months after employment has been terminated, "(1) engage in any business activity competitive with activities of the Company (referred to collectively as the 'Business')" or "(2) solicit for or do business on any project involving the Business, or any component thereof, with any customer or partner of the Company or any potential customer or partner (as defined below) of the Company with whom or with which I have had contact during my employment or engagement by the Company."

225.    Simons does not believe the purported non-compete and non-solicit provisions are enforceable.  However, the existence of those provisions and Ditto Holdings' purported termination of him for "cause" may nonetheless impact Simons' ability to obtain employment in the financial services and related industries due to fears that Ditto would file suit against Simons and/or prospective employers based on the non-competition agreement.

226.    Simons' injury can be addressed by a declaratory judgment stating that Simons was not fired for "cause" as that term is defined in the Confidentiality Agreement.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count XIV declaring that his employment with Ditto was not terminated for "cause", and award such other relief as is deemed just and proper.

## JURY DEMAND

Simons demands a trial by jury on all claims so triable.

Dated: January 16, 2014          Respectfully submitted,

/s/  Allen Woolley

W. Allen Woolley
Teresa A. Sullivan
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 201-2000
(312) 201-2555 (facsimile)
Attorneys for Plaintiff Paul Simons