IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **PAUL SIMONS**, an Individual,<br><br>                Plaintiff,<br><br>      v.<br><br>**DITTO TRADE, INC.**, an Illinois Corporation, **DITTO HOLDINGS, INC.**, a Delaware Corporation, and **JOSEPH FOX**, an Individual,<br><br>                Defendants. | **Case No. 14 C 309**<br><br>Hon. Harry D. Leinenweber |

**MEMORANDUM OPINION AND ORDER**

**I.  BACKGROUND**

Defendant Ditto Holdings, Inc. ("Holdings") is the parent of Defendant Ditto Trade, Inc. ("Trade"), and is a Broker-Dealer, registered with the Securities Exchange Commission (the "SEC"). The Plaintiff, Paul Simons ("Simons"), is the former Chief Executive Officer ("CEO") of Trade and was a member of the Board of Directors of Holdings. Before joining Trade, Simons had spent twenty-five (25) years in the financial industry, including stints as Managing Director of Wealth Management at Credit Suisse and as a Managing Director of Merrill Lynch.

In January 2013, Simons was recruited by Defendant Joseph Fox ("Fox"), co-founder of the Ditto companies and CEO of Holdings, to serve as CEO of Trade. To help Simons decide whether to join Trade, Fox provided, detailed information relating to the Ditto

entities' current and historical financial picture, its business model, strategic initiatives, and technology investments. Based on this information Simons agreed to join Trade as CEO and Holdings as Executive Vice President, and to accept a compensation package that was to be comprised of 10% salary and 90% equity in the form of options to purchase Trade stock. The compensation package agreed upon consisted of a salary of $120,000 per year plus options to purchase 1.5 million shares of Trade's common stock at an exercise price of $0.70 per share, with the options vesting ratably over four years.

During the latter half of 2013, while reviewing company records, Simmons discovered evidence which he believed raised serious concerns regarding company expenditures, and serious law violations on Fox's part. His review of records also led him to conclude that Fox had supplied him with false and misleading financial information upon which his compensation package was based. He concluded that Fox had overstated 2012 revenues by a factor of four, had drastically understated expenses, and some of the "strategic initiatives" and "technology investments" did not exist. Accordingly, he believed the equity component of his compensation was substantially overvalued at the time he accepted the offer of employment.

Believing that some of the alleged financial irregularities indicated potential violations of federal and state securities laws, Simons reported his concerns to Holdings' Board. Simons also

reported his concerns to the SEC.  As a result, the Defendants took swift revenge and Simons was barred from his office, terminated as CEO by Trade, removed from Holding's Board, terminated from his position as Executive Vice President of Holdings, and denied both the delivery of his restricted stock and the right to exercise his fully vested options.  As a result of the forgoing, Simons has filed a 14-Count Complaint.  The Defendants have moved to dismiss six of the counts:  Count II, Common Law Retaliation against Fox; Count IV, Common Law Fraud; Count V, Fraud under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5; Count VI, Section 20(b) of the Act against Fox; Count VIII, Breach of Contract–Stock Option; and Count XII, Indemnification.

The Defendants have also filed Counterclaims against Simons, alleging that, prior to Simons' termination, he had been scheming to drive out existing senior management and take over the companies and once his scheme was thwarted, he set out to destroy the companies and set up a competing enterprise.  His method was to access confidential company information in violation of his confidentiality agreement, and use the information, with deliberate indifference, to accuse executives, including Fox, of wrongdoing and to publish the information both inside and outside the companies, and specifically to publish to the companies' investors and shareholders.  He also sent his information to Ditto's investment banker causing him to withdraw.  He also contacted the PGA and gave it false information that prevented a relationship

from developing. Then Simons sought to buy out Fox and other investors at discount prices. Failing to do so he began soliciting investors to fund a venture to compete with Ditto in violation of his non-compete agreement. The result of his actions was to diminish the value of Ditto. Count I of the Counterclaim alleges Breach of Fiduciary Duty; Count II, Breach of Confidentiality Agreement; Count III, Breach of Employment Agreement; Count IV, Tortious Interference with Prospective Economic Advantage; and Count V, Defamation. Simons has moved to dismiss each of these Counts.

## II. DISCUSSION

### A. Defendants' Motion to Dismiss

First, Defendants move to dismiss Count II for retaliation. They contend that Fox was not Simons employer, but rather it was Ditto. Simons claims in response that where a dominant party controls a corporation and acts as its alter ego, that party can be held liable for the corporation's tortious conduct, including wrongful termination. Under Illinois alter ego law, a plaintiff must plead both a unity of interest and ownership and facts which show that adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice. While Simons as pled unity of interest, he has failed to allege any facts that would show that failure to find an alter ego relationship would sanction a fraud or promote injustice, such as under capitalization which might make collection of a judgment difficult.

*Sea-Land Services, Inc. v. Pepper Source,* 941 F.2d 519 (7th Cir. 1991).

Plaintiff's three fraud counts, IV, V, and VI, set forth a scenario in which Defendants lured him into an employment relationship with them by knowingly misrepresenting the company's value and prospects, in order to entice him to accept equity in the form of stock options in lieu of cash salary, thus violating the securities laws and common law fraud.

In order to prove a securities fraud claim under Section 10(b), Rule 10b-5, and Section 20(b), a plaintiff must plead facts showing that: (1) the defendant made a false statement or omission; (2) of a material fact (3) with scienter; (4) in connection with a purchase or sale of securities; (5) upon which the plaintiff justifiably relied; (6) and the false statement proximately caused the plaintiff's damages. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645m 648 (7th Cir. 1997). The pleadings of the fraud counts also require that the who, what, when, where and how of the alleged fraud. *Id.* The Defendants claim that Simons failed to allege each of the required allegations for proof of fraud, and specifically with regard to the securities counts, fails to allege that any loss occurred with respect to the purchase or sale of stock. They also argue lack of plausibility as required by *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

It seems to the Court that the Defendants have the better of the argument. It would be plausible that the Defendants, in order to obtain Plaintiff's services at a greatly reduced cash price, might tend to paint an overly rosy view of the company's prospects in order get him to take the financial package consisting of a relative small amount of cash together with a large amount of equity in the form of stock options. According to the Complaint, his package was supposed to include $120,000 a year in base salary and options worth 90% of his salary. According to the contract he was to be vested in 375,000 shares a year for four years. Further, he was shown financials that, according to the Complaint, justified such a belief. While option pricing is complicated, there are certain formulae that allegedly provide a pricing mechanism, although without a market for the stock, pricing is difficult. *See,* "Understanding Option Pricing" *http://www.investopedia.com/articles/optioninvestor/07options_beat_market.asp.* The main factor in pricing an option is of course intrinsic value, which, in a closely-held company, would depend on information obtained from the financial books. If the books were doctored upward, they would show a higher intrinsic value, leading to a higher value for Simons' options, and vice versa. Simons received options, which are a security, as a part of his salary, thus Simons has adequately pleaded the "in connection with" element of a securities claim. His Complaint also pled scienter, *i.e.,* that Defendants knew the books were doctored. However, Defendants argue that the Plaintiff

cannot prove the causation element. This element includes both transaction causation and loss causation. The Plaintiff certainly has pled the former. He would not have accepted employment under those terms if he had known the true financial state of Ditto. However, where his securities claims falter is in alleging loss causation. The fact of the matter is that Plaintiff has not adequately alleged that he suffered a loss as a result of the employment transaction. He has not alleged that he exercised or attempted to exercise any of the options which may or may not result in a loss in the future. To the extent that Simons claims that defendants are denying him the right to exercise the options this is a matter of breach of contract. In the cases cited by Plaintiff, the claimants actually lost their investments when their employers went bankrupt. If Plaintiff had sold the options or exercised the option and sold the underlying stock, he would possibly have a loss which could arguably be said was caused by the fraud. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 949 (9th Cir. 2005). Since all fraud counts need loss causation, Counts IV, V, and VI are dismissed.

The Defendants also move to dismiss Count VIII for breach of contract of the stock option agreement. Their argument is straight forward. Simons did not exercise his option rights in a timely manner. The Agreement provided that the option to purchase vested shares, here 375,000, expired if Plaintiff did not "exercise the vested portion of the option on or before the earlier of (I) ninety

days after [his] termination of service and (ii) the option expiration date." In order to exercise the option, the employee, Simons, needed to give a written notice stating his election to exercise, identify the number of shares for which Plaintiff was exercising the option, and tender full payment of the exercise price, here $.70 per share. According to the Complaint, Simons was terminated on September 10, 2012. He does not allege that he served the required notice together with the full payment of the exercise price within 90 days of his termination. He argues that it was futile but there is nothing in the Complaint that would support futility. *See, Swiss Bank Corp. v. Dressler Industries, Inc.,* 141 F.3d 689, 692 (7th Cir. 1998) ("[W]hen a performing party is not told and does not know that his tender of performance will be refused, he must tender, rather than force a court to decide years later what would have happened had he tendered."). Therefore, Count VIII is dismissed.

Lastly, Defendants move to dismiss Count XII for indemnification as unripe. Plaintiff is a defendant in a Cook County Lawsuit for which he asks for indemnification. The case is apparently stayed pending an appeal. Defendants ask that the Count be dismissed but the better way is to stay it pending the outcome. Count XII is stayed.

**B. Plaintiff's Motion to Dismiss Defendants' Counterclaims**

Simons' Motion to Dismiss the Counterclaims is based upon his argument that the scenario Defendants' set up is totally

implausible.  The scenario is that Simons deliberately set out to damage Ditto so as to bring down the share price of its stock so he could buy out the shareholders, including Fox at a greatly discounted share price.  Why an employee, who held a large number of options and warrants, would seek to destroy their value by torpedoing the underlying share price, is, according to Simons, implausible.  Specifically, Simons seeks to have Count I, Breach of Fiduciary Duty, dismissed as not supportable under the Delaware Supreme Court case of *Malone v. Brincat,* 722 A.2d 5, (Del. Supr. 1998).  The specific basis of Count I is a letter Simons sent to the Ditto shareholders in which he alludes to "information and circumstances which raised serious questions and concerns regarding certain company expenditures and related transactions, certain transactions in company shares, and circumstances pertaining to financial governance generally."  He then advised the shareholders that he "together with several other officers fo the company . . . requested a meeting with the board to authorize an independent audit and investigation in order to determine whether or not this information evidenced any impropriety and/or required and remedy. He made clear that he was not asserting "any allegations of conclusive wrongdoing."  The problem with Count I is that the communication to the shareholders contains no false information, willful or not.  It merely states as a director Simons uncovered questionable information and requested an independent audit.  This is hardly a violation of fiduciary duty.  Count I is dismissed.

Count II alleges a breach of a confidentiality agreement. It is alleged that Simons disseminated "confidential information . . . to third parties" and [misused] information for his own purposes. . . ." However, as noted above, Simons did not "disseminate" any confidential information to shareholders. The only information disseminated was that he had requested an audit which is hardly confidential information. Officers and directors have a fiduciary duty to the shareholders not to sit idly by and ignore possible violations of law. Where, as here, all Simons did was notify shareholders that he had certain suspicion and asked for an audit seeking to determine whether there was any actual wrongdoing. This is far different from deliberately misstating facts to the shareholders by misusing confidential information. Count II is dismissed.

Count III seeks damages for breach of Simons' employment contract. The contract states that Simons will "maintain [his] current brokerage licenses and will obtain any additional licenses necessary to [his] duties as CEO, as mutually agreed." Defendants allege that Simons did not obtain a supervisory license that was necessary. However, the Complaint does not allege that this was one of his "current licenses." It cannot be argued that the parties mutually agreed that Simons would obtain the supervisory license because this was not made a part of the employment agreement. As Simons points out, where parties who make them a provision of their contract "subject to" a later agreement neither

party is bound.  *Marcatante v. City of Chicago,* 657 F.3d 433, 443 (7th Cir. 2011).  Count III is dismissed.

Count IV alleges a claim for tortious interference with prospective economic advantage.  The elements of this claim are (1) Plaintiff's reasonable expectancy of entering into a valid business relationship; (2) Defendants' knowledge of that expectancy; (3) Defendants' intentional and unjustifiable interference that induced or cause a breach or termination of the expectancy; and (4) damages.  *F:AJ Kikson v. Underwriters Labs., Inc.,* 492 F.3d 794, 800 (7th Cir. 2007).  The basis of this claim is two instances: the first instance with an investment banking firm, FBR and the second with PGA of America.  The first involved the sending of "an anonymous unmarked envelope" containing motion papers filed in the litigation between Ditto and Simons to FBR.  This resulted in FBR declining to enter into an engagement with Ditto.  The second involved discussions between Ditto and PGA about a possible joint venture.  Simons allegedly told the PGA that Ditto was illegally using the PGA' "likeness" and had represented falsely that it had a partnership with the PGA.  This allegedly ruined any possibility of a relationship between Ditto and the PGA.  The Court believes that this is sufficient at this stage to state a claim for tortious interference.  The Motion to Dismiss Count IV is denied.

The final count of the Counterclaim is Count V, defamation.  The Complaint states that Simons made "false and misleading statements to Ditto shareholders, employees, Board members,

investors and customers . . . "; that "Fox had lied about Ditto's business affiliations"; that "Fox had engaged in wrongful financial transaction"; and that "Fox may have engaged in insider trading. . . ." As Simons points out, Fox fails to state the exact language of the alleged defamatory statement as required by Illinois law. *Vantassell-Matin v. Nelson,* 741 F.Supp. 698, 707 (N.D. Ill. 1990). While the letter of September 9, 2013, (Exhibit B to Simons Motion to Dismiss) contains specific allegations of wrongdoing, there is no indication in Count V, whether Fox is relying on the statements related in this document, or some other document, or some oral statement or some others. If Fox is relying on one or more of these allegations or some others he should say so. Count V is dismissed without prejudice.

### III. CONCLUSION

For the reasons stated herein, Defendants' Motions to Dismiss Counts II, IV, V, VI, and VIII are granted. Defendants' Motion to Dismiss Count XII is denied but said Count is stayed pending resolution in the State Court. Plaintiff's Motions to Dismiss Counterclaims numbers I, II, and II are granted. Plaintiff's Motion to Dismiss Counterclaim IV is denied. Plaintiff's Motion to Dismiss Counterclaim V is granted without prejudice.

The Court would like to make an observation. The parties should consider long and hard before requesting leave to amend any of the dismissed counts other than Counterclaim V. To say that the parties, particularly the Plaintiff, have attempted to plead the

kitchen sink with respect to what appears to be a relatively simple employment case, is to understate the obvious.  The Court would suggest to the parties, particularly the Plaintiff, to consider the problems associated with instructing a jury with such a mishmash of legal theories.  To expect a jury to wade though the necessary issue instructions, together with the explanatory and definitional instructions would be monumental.  Enough said!

**IT IS SO ORDERED.**

                                              Harry D. Leinenweber, Judge
                                              United States District Court

Date:8/8/2014